J-S47040-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: C.F., JR. & C.F., MINORS | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: C.F., FATHER | : | No. 756 MDA 2020 |

Appeal from the Order Entered April 22, 2020
in the Court of Common Pleas of Dauphin County
Juvenile Division at No(s): CP-22-DP-0000173-2017
CP-22-DP-0000174-2017

| | | |
|---|---|---|
| IN THE INT. OF: C.F., JR. & C.F., MINORS | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: C.F., FATHER | : | No. 757 MDA 2020 |

Appeal from the Order Entered April 22, 2020
in the Court of Common Pleas of Dauphin County
Juvenile Division at No(s): CP-22-DP-0000173-2017
CP-22-DP-0000174-2017

BEFORE:   STABILE, J., NICHOLS, J. and STRASSBURGER, J.[*]

MEMORANDUM BY STRASSBURGER, J.:          **FILED DECEMBER 01, 2020**

C.F. (Father) appeals from the April 22, 2020 orders,[1] changing the

permanent placement goals of his twin children, C.F., Jr., a male, and C.F., a

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] The juvenile court dated its orders April 22, 2020, and filed them on May 15, 2020, but did not initially enter them on the docket.  This Court issued orders on June 18, 2020, directing the juvenile court to enter its orders.  The juvenile court complied, filing updated dockets in this Court on June 25, 2020.  For the sake of simplicity, we refer to the juvenile court's orders as the "April 22, 2020 orders."

female (collectively, Children), born in February 2014, to adoption.[2] We affirm.

Dauphin County Social Services for Children and Youth (the Agency) has been involved with this family "off and on" since 2013. N.T., 4/22/2020, at 29. On September 18, 2017, the Agency filed dependency petitions regarding Children. The petitions alleged that Children were without proper parental care or control due to unstable housing, poor housing conditions, a lack of food, missed medical appointments, and inadequate supervision. Most significantly, the Agency averred that Mother was charged with endangering the welfare of children after an incident during which she left Children and siblings home with inappropriate supervision. A no-contact order was put in place as a condition of Mother's bail, and the Agency planned that Father would act as Children's primary caregiver. However, the Agency averred that Father failed to maintain stable housing, and that he and Children were transient. The juvenile court entered orders adjudicating Children dependent on October 19, 2017. The orders directed that Children would remain with Father under court supervision.

Less than a month later, on November 6, 2017, the Agency filed motions to remove Children from Father's custody and place them in foster

---

[2] Children's mother, A.F. (Mother), did not appeal. Children also have siblings who were adjudicated dependent, but the siblings are not involved in this appeal.

care. The Agency averred that the family's housing remained unstable, that Father was uncooperative and belligerent toward the Agency, and that Mother was engaging in substance abuse. The juvenile court granted the motions that same day and entered shelter care orders on November 22, 2017. Although Father made little, if any, progress toward compliance with Agency services for over the next year, Mother made substantial progress. The court returned Children to Mother by orders entered April 4, 2019, while maintaining court supervision.[3]

Children remained in Mother's care only briefly before the Agency filed petitions to remove them on May 28, 2019. Therein, the Agency averred that it received a report alleging Mother and Father were the perpetrators of child sexual abuse, and that it had already removed Children pursuant to the juvenile court's verbal order.[4] The court entered orders formally granting the Agency's motions for removal, followed by shelter care orders.

Finally, on March 23, 2020, the Agency filed a motion requesting that the juvenile court change Children's permanent placement goals from return to parent or guardian to adoption. At the conclusion of the April 22, 2020

---

[3] The record indicates that Mother and Father were separated at the time.

[4] Mother was indicated as a perpetrator of abuse, but Father was not. N.T., 4/22/2020, at 29. The details of the abuse are not entirely clear, although documentation in the record indicates that it did not involve Children. From what we can discern, Mother's abuse involved a "massage parlor" in her home and an "escort website." *Id.* at 30.

permanency review hearing for Children and their siblings, the court announced that it would change Children's goals to adoption, with a concurrent goal of permanent legal custody.[5]  Subsequently, the court

_____

[5] The juvenile court began its explanation of its decision by stating that it was "very clear to this [c]ourt, not just by a preponderance of the evidence but by much further, that [Children and their siblings] remain dependent." N.T., 4/22/2020, at 68.  It then made the announcement about the change in permanent placement goals and other findings required by the Juvenile Act at permanency review hearings.

It is unclear what evidentiary burden the juvenile court used to determine Children's permanency goal.  The Juvenile Act specifies that an adjudication of dependency must be proved by clear and convincing evidence, but it does not address specifically the applicable burden of proof to change a child's permanent permanency goal.  **Compare** 42 Pa.C.S. § 6341(c) with **id.** at § 6351.  **Accord In re R.J.T.**, 9 A.3d 1179, 1183 (Pa. 2010) (explaining that a "goal change" is a "term of art … consistent with 42 Pa.C.S. § 6351(g), which requires the trial court, at the conclusion of a permanency hearing, to 'order the continuation, modification or termination of placement or other disposition which is best suited to the safety, protection and physical, mental and moral welfare of the child.'").

On one occasion, this Court has rejected the notion that a change in goal requires proof by clear and convincing evidence, stating instead that once a child is adjudicated dependent by clear and convincing evidence, modification of the "long-range goal" and "issues of custody and continuation of foster care are determined according to a child's best interests." **In Interest of Sweeney**, 574 A.2d 690, 691 (Pa. Super. 1990). However, best interests of the child does not correlate to an evidentiary burden of proof, a legal concept that the United States Supreme Court has described as a "concept … embodied in the Due Process Clause" of the United States Constitution, which functions to "'instruct the factfinder concerning the degree of confidence our society thinks [the factfinder] should have in the correctness of factual conclusions for a particular type of adjudication.'" **Santosky v. Kramer**, 455 U.S. 745, 754-55 (1982) (quoting **Addington v. Texas**, 441 U.S. 418, 423 (1979)).  In other cases where a change to the permanency goal was at issue, without discussing **Sweeney** or the correct burden of proof for a goal change, this Court
*(Footnote Continued Next Page)*

entered orders memorializing its decision. Father timely filed notices of appeal, along with concise statements of errors complained of on appeal, on May 21, 2020.[6]

Father now raises the following claims for our review.

> A. Whether Father's efforts towards his service objectives, such as visitation, employment, and obtaining a residence, demonstrate that reunification is in the best interest of [C]hildren, and that the Agency has failed to satisfy its burden

*(Footnote Continued)* ───────────

seemingly reviewed the goal change to determine whether the juvenile court properly found that the agency proved its case by clear and convincing evidence, rather than a preponderance of the evidence. *See*, *e.g.*, *In re K.D.*, 871 A.2d 823, 831 (Pa. Super. 2005) ("The goal change from reunification to adoption, under any relevant analysis, is clearly and convincingly supported by evidence of record.").

Father does not allege the juvenile court evaluated the goal change request using an improper burden of proof. Furthermore, to the extent clear and convincing evidence is required, the juvenile court stated the Agency proved its case by "by much further" than a preponderance of the evidence, and we are satisfied that the evidence the Agency produced was sufficient to meet the "clear and convincing" standard.

[6] On June 18, 2020, this Court entered orders directing Father to show cause why we should not quash his appeals based on noncompliance with, among other things, our Supreme Court's holding in *Commonwealth v. Walker*, 185 A.3d 969, 976-77 (Pa. 2018) (explaining that the Note to Pa.R.A.P. 341 creates a bright-line rule, pursuant to which separate notices of appeal must be filed whenever one or more orders resolve issues arising on more than one docket). Father's counsel filed responses, averring that he filed separate notices of appeal via PACFile, in compliance with *Walker*. Upon review, we are satisfied that counsel filed separate notices of appeal, and that *Walker* does not mandate quashal of Father's appeals. *See also Commonwealth v. Jerome Johnson*, 236 A.3d 1141, 1148 (Pa. Super. 2020) (*en banc*) ("We should not invalidate an otherwise timely appeal based on the inclusion of multiple docket numbers, a practice that the Rules [of Appellate Procedure] themselves do not expressly forbid.").

o[f] showing that a change in the goal to adoption is in the best interest of [C]hildren.

B. Whether the Agency has failed to make reasonable efforts to return [] Children to Father because his service objectives are not clearly stated and are conflated with those of [Mother].

Father's Brief at 7 (suggested answers omitted).

When reviewing an order changing a child's permanent placement goal, this Court applies an abuse of discretion standard of review. ***In the Interest of D.R.-W.***, 227 A.3d 905, 917 (Pa. Super. 2020). We must accept the juvenile court's factual findings and credibility determinations if the record supports them, but need not accept the court's inferences or legal conclusions. ***Id.***

The Juvenile Act governs goal change proceedings. ***See*** 42 Pa.C.S. §§ 6301-6375. The pertinent analysis is as follows.

Pursuant to [42 Pa.C.S.] § 6351(f) of the Juvenile Act, when considering a petition for a goal change for a dependent child, the juvenile court is to consider, *inter alia:* (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months. The best interests of the child, and not the interests of the parent, must guide the trial court.

***In re A.B.***, 19 A.3d 1084, 1088-89 (Pa. Super. 2011) (citations and quotation marks omitted).

- 6 -

Father's first claim is that the Agency failed to prove that changing Children's permanent placement goals from return to parent or guardian to adoption would be in their best interests. Father's Brief at 12-19. He argues that he made progress toward compliance with his service objectives by attending visits, obtaining housing and employment, completing a parenting class, and completing a psychological evaluation. *Id.* at 12, 18-19. Father analogizes his circumstances to those of the appellants in *In the Interest of A.W.*, 162 A.3d 1117 (Pa. Super. 2017), and *In Interest of T.J.J.M.*, 190 A.3d 618 (Pa. Super. 2018), in which this Court reversed and vacated goal change orders due to progress with services. *Id.* at 16-18.

In the instant case, the juvenile court explained its decision to change Children's goals to adoption as follows, in relevant part.

> Despite the supports offered by the Agency which date to 2017, Father has failed to sustain even minimal compliance with service objectives which sought to ensure safe and stable lives for Children. Father admitted however, that in the past, compliance with the objectives interfered with his life. Meanwhile, the opportunity for permanency for Children was postponed. The Pennsylvania Superior Court has reminded that "[a] child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." *In re Adoption of M.E.P.*, 825 A.2d 1266, 1276 (Pa. Super. 2003) (citation omitted).

Juvenile Court Opinion, 7/21/2020, at 9-10.

Our review of the certified record supports the juvenile court's decision. As summarized above, Children entered foster care in November 2017. The juvenile court returned Children to Mother's care by orders entered in April 2019, only to remove them again in May 2019. By the time

- 7 -

of the goal change hearing in April 2020, Children had remained in foster care almost continuously for just under two and a half years.

Meanwhile, Father made minimal progress toward regaining custody of Children. The Agency caseworker, Kaylie Petersheim, testified that Father failed to provide his contact information for "extensive periods of time" and did not comply with his service objectives. N.T., 4/22/2020, at 31-35, 40. Additionally, he completed a psychological evaluation as requested, but did not follow through with the evaluation's recommendations.[7] *Id.* at 32. Father also failed to provide drug screens during the last review period. *Id.* at 32-33. Ms. Petersheim explained that Father "admitted to consistently smoking marijuana and that he always will smoke marijuana and he still wouldn't give urine screens." *Id.* at 40. In addition, she did not have any documentation confirming that Father had employment, and Father did not provide her with an address of his residence.[8] *Id.* at 31-32.

---

[7] The recommendations included attending individual and marital counseling, completing a parenting class, continuing with drug screens, obtaining a drug and alcohol assessment, attending visitation with Children, completing a housing program, cooperating with the Agency, and ultimately reunifying with Children. N.T., 4/22/2020, at 41.

[8] While Father testified that he had employment for the last month and a residence, and that he was "in the process of getting a bigger place," the juvenile court was free to reject Father's testimony as incredible. N.T., 4/22/2020, at 63-66; *see In the Interest of D.F.*, 165 A.3d 960, 966 (Pa. Super. 2017) ("The [juvenile c]ourt is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence.").

Father also displayed little interest in attending visits with Children. Ms. Petersheim testified the Agency offered Father one visit every other week, with the first visit occurring at the Agency, and the second visit occurring "up where [C]hildren were placed an hour and a half away, just to make it easier for the kids." *Id.* at 38. She explained that the Agency offered Father transportation to the visits that would occur an hour and a half away, but that he declined the Agency's offer, and instead exercised only one visit per month. *Id.*

Thus, the record demonstrates that Father remained in no position to provide appropriate parental care or control for Children at the time of the goal change hearing, despite years of opportunities. It was within the juvenile court's discretion to conclude that Children's lives should not remain on hold indefinitely, and that a goal change to adoption would be in their best interests. *See In re J.D.H.*, 171 A.3d 903 (Pa. Super. 2017) (quoting *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006)) ("'[A] child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future.'"). Father's first claim does not entitle him to relief.

Father argues in his second claim that the Agency failed to provide him with reasonable reunification efforts. Father's Brief at 12-13, 19-23. Father

waived this claim by failing to include it in his concise statements of errors complained of on appeal. **See In re M.Z.T.M.W.**, 163 A.3d 462, 466 (Pa. Super. 2017) ("[I]t is well-settled that issues not included in an appellant's … concise statement of errors complained of on appeal are waived.").

Even if Father had not waived this claim, we would conclude that it is meritless. In substance, Father's argument is that the Agency did not make it clear to him what his service objectives were. He directs our attention to his objectives as they appeared in the Agency's motion requesting a goal change,[9] and contends that the Agency's testimony faulted him for failing to complete objectives that were not listed. Father's Brief at 12, 21-22. He also insists that it was ambiguous whether certain objectives applied to him or to Mother only, and that the Agency's testimony conflated his compliance with Mother's compliance. **Id.** at 12, 21-23. Father likens his situation to that of the appellant in **In the Interest of T.M.W.**, 232 A.3d 937 (Pa. Super. 2020), in which this Court vacated a goal change order, emphasizing that the agency did not inform the appellant for more than four months that the psychological treatment she was receiving was inadequate to satisfy its concerns. **Id.** at 19-21.

Our review of the record belies Father's claim. Ms. Petersheim testified regarding Father's and Mother's service objectives, including

_____

[9] More specifically, Father appears to rely on the "Juvenile Court Statement for Permanency Services" attached to the motion.

- 10 -

whether the objectives applied to one or both of the parents, and whether the parents had complied or not complied. N.T., 4/22/2020, at 31-35. This testimony corresponded to the objectives as they appeared in the Agency's motion, which included the same information in a clear and concise fashion. Moreover, Ms. Petersheim testified that she "had meetings" with Father to discuss his objectives, which remained the same throughout Children's dependency.[10] *Id.* at 55.

Notably, Father also testified during the hearing, and he did not indicate in any way that he did not understand what his service objectives were. His testimony implied that he was aware of his objectives, but that he simply chose not to comply with them and instead "cut ties" with the Agency because the reunification process was interfering with his personal life and employment. *See id.* at 65 ("I needed to cut ties with [the Agency] at that moment … to get myself together because … it was interfering with my personal life and me being stable and maintaining employment and everything.").

The only suggestion that Father's service objectives were not clear came from Father's counsel during his cross-examination of Ms. Petersheim.

---

[10] Upon review, the Agency's only change to Father's objectives after January 2018 was a modification to the terms of his drug screen objective, and the addition of an objective directing him to resolve all criminal matters and avoid further criminal charges. This latter objective resulted from criminal charges Father allegedly received in April 2018.

*See id.* at 41-42. Specifically, Father's counsel observed that the Agency wanted Father to complete a parenting class, but that parenting classes appeared as an objective for Mother only on the Motion for Permanency Review. *Id.* Ms. Petersheim clarified that completing a psychological evaluation and complying with its recommendations was listed as one of Father's objectives, and that his evaluation recommended that he complete a parenting class. *Id.* at 42. She explained that Father should have been aware of this recommendation, as he "received many copies of his psychological evaluation. … I know that I've given him numerous, numerous copies and I've highlighted every single thing that he was supposed to do for him." *Id.* Father's testimony appeared to confirm Ms. Petersheim's assertion, as he indicated that he "had to go to parenting [class]" at an unspecified time in the past. *Id.* at 65. Indeed, Father now asserts on appeal that he completed a parenting class in compliance with his objectives. Father's Brief at 9-11, 18, 22. We see no basis upon which to conclude that it would have been difficult for Father to discern his objectives.

Based on the foregoing analysis, the juvenile court did not abuse its discretion by changing Children's permanent placement goals to adoption. In addition, Father waived his claim that the Agency failed to provide him with reasonable reunification efforts. Even if Father had not waived that claim, it would be meritless. Therefore, we affirm the court's April 22, 2020 orders.

Orders affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 12/1/2020